[No. G010153. Fourth Dist., Div. Three. Sept. 30, 1991.]

STRUCTURAL STEEL FABRICATORS, INC., Plaintiff and Appellant, v. CITY OF ORANGE, Defendant and Respondent.

**COUNSEL**

Ralph Evans for Plaintiff and Appellant.

Cummings & Kemp, Thomas B. Cummings and John S. Roth for Defendant and Respondent.

**OPINION**

**SONENSHINE, Acting P. J.**—Structural Steel Fabricators, Inc. (Structural), appeals a summary judgment[1] entered against it after the trial court determined its lawsuit was not filed within the time limits prescribed by Civil Code section 3210. The sole issue presented is whether the court was correct in concluding estoppel could not be asserted to extend the statute of limitations.

I.

In February 1988, Structural, as subcontractor, entered into a contract with IDC Construction (IDC), as general contractor, to perform structural steel fabrication for the City of Orange. In October, IDC walked off the job site, and Contractor Surety Bonding Company (CSBC) assumed its role. Structural received partial payment from CSBC; however, CSBC left before Structural was paid in full.

On January 4, 1989, Structural served a stop notice[2] upon the city, demanding that it withhold the sum of $30,086 from CSBC. Instead, the city permitted CSBC to "bond around" the stop notice.[3]

On May 26, Structural filed a lawsuit against IDC and CSBC. In September, Structural obtained a $27,350 default judgment. A month earlier, however, IDC filed a chapter 7 bankruptcy proceeding and CSBC went out of business.[4]

---

[1] Structural purports to appeal from the nonappealable minute order granting the motion for summary judgment. Nonetheless, in the interest of judicial economy, we treat the appeal as one properly taken from a judgment of dismissal entered after the motion was granted. (*State Farm & Casualty Co.* v. *Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199, 202, fn. 1 [209 Cal.Rptr. 251].)

[2] Civil Code section 3103 defines "stop notice" as "a written notice, signed and verified by the claimant or his or her agent, stating in general terms all of the following: [¶] (a) The kind of labor, services, equipment, or materials furnished or agreed to be furnished by such claimant. [¶] (b) The name of the person to or for whom the same was done or furnished. [¶] (c) The amount in value, as near as may be, of that already done or furnished and of the whole agreed to be done or furnished. [¶] (d) The name and address of the claimant."

[3] Pursuant to Civil Code section 3186, a public entity, upon receipt of a stop notice, is required "to withhold from the original contractor . . . money or bonds (where bonds are to be issued in payment for the work of improvement) due or to become due to such contractor in an amount sufficient to answer the claim stated in such stop notice . . . ."

In lieu of withholding the sum demanded, however, the public entity may permit the original contractor to file a bond in an amount equal to 125 percent of the claim. (Civ. Code, § 3196.)

[4] We are informed that because the bonding company was not licensed in this state as an insurance company, the claim is not payable by the California Insurance Guarantee Association. (See Ins. Code, § 1063.)

Meanwhile, on June 21, 1989, while its lawsuit against IDC and CSBC was pending, Structural made a demand upon the city, claiming the sum of $24,894 was due. A corrected demand was served on June 27, indicating the proper amount was $30,086.

On November 6, Structural filed a separate lawsuit against the city to enforce the stop notice.[5] In its first amended complaint filed in June 1990, Structural alleged the city "has either paid the money due Plaintiff to the unlicensed bonding company or still retains the money." It admitted the statute of limitations to enforce the stop notice[6] had expired on July 4, 1989; however, it claimed that the city's conduct had tolled the statute.[7]

The city's motion for summary judgment was filed on July 6, 1990, alleging that Structural's complaint was not filed in accordance within the time limits prescribed by Civil Code section 3210. The city filed no declarations to demonstrate the alleged lack of evidence to sustain the complaint. It asserted, "The facts on which [Structural] hopes to estop the City of Orange from relying on the statute of limitations are either irrelevant to the question, or are merely allegations for which there is absolutely no supporting evidence."

Structural opposed the motion on grounds the statute was tolled while it was pursuing an alternate remedy, and the city should be estopped from asserting the statute in light of its conduct in influencing Structural not to pursue enforcement of the stop notice.

A declaration of Structural's president alleged he had relied on the city's representations it was looking into his claim and that he had filed this action

---

[5]The complaint included a second cause of action for negligence in selecting the bonding company. It was later dismissed by Structural.

[6]An action to enforce a stop notice must be filed no later than 90 days after the last date on which the stop notice could have been served.

Civil Code section 3210 provides: "An action against the original contractor and the public entity to enforce payment of the claim stated in the stop notice may be commenced at any time after 10 days from the date of the service of the stop notice upon the public entity and shall be commenced not later than 90 days following the expiration of the period within which stop notices must be filed as provided in Section 3184."

Civil Code section 3184 requires service of a stop notice within 30 days after recording a notice of completion or notice of cessation, if such notice is recorded. In the event the notice of completion or notice of cessation is not recorded, the stop notice must be served within 90 days after completion or cessation.

[7]Structural alleged the statute was tolled because (1) the city was on notice that Structural was pursuing other remedies against IDC and CSBC; (2) the city was not prejudiced by the delay; (3) Structural acted reasonably in pursuing IDC and CSBC; (4) Structural did not learn that it was unable to collect from CSBC until after the statute had run; (5) the city was aware the statute was running; (6) the city intended for Structural to rely upon its representations that it would settle the case; and (7) Structural did rely on those representations.

"as soon as it became clear that the bonding company . . . was not going to pay." He explained that he obtained a default judgment and scheduled a judgment debtor examination, but no one showed up. He further stated, "The city did not change it's [*sic*] position to prejudice themselves while this was going on. They knew, through calls [and] letters from myself and [counsel], that we were still pursuing our rights under the stop notice. They would always say that they were working on it or that they would look into it. They never denied my claim. So long as our action against the bonding company appeared to have a realistic chance for resolution, we held off suing the city because we felt that we had to."

## II.

In granting summary judgment, the trial court concluded *A. J. Setting Co. v. Trustees of Cal. State University & Colleges* (1981) 119 Cal.App.3d 374 [174 Cal.Rptr. 43] was applicable. In *Setting*, a general contractor contracted with Trustees of the California State University and Colleges to install a boiler system. The general contractor subcontracted with Setting. After monies owing were not paid, Setting sued the general contractor. The trustees, who had been joined as a defendant to enforce payment of funds retained pursuant to a stop notice, successfully moved for summary judgment.

The trial court concluded the action was untimely pursuant to Civil Code section 3210 and that estoppel could not be asserted to extend the prescribed time limits.[8] The appellate court affirmed.

In reaching its decision, the court recognized that with respect to public entities, " ' "ordinarily estoppel should not be invoked where to do so would be harmful to some specific public policy or public interest or where it would enlarge the power of the governmental agency or expand the authority of a public official." ' [Citation.]" (119 Cal.App.3d at p. 380.) For this reason, the court explained, its task was twofold: First, it would consider the public policy behind enactment of the stop notice statutes in light of the rights and duties of the parties involved. It would then consider the effect estoppel would have on those rights and duties.

The *Setting* court, noting that public property cannot be encumbered by mechanics' liens, proceeded to explain that the stop notice statutes were enacted to establish, for the benefit of claimants, a right to payment

---

[8]The court also found that even if estoppel was applicable, the subcontractor had not established facts which, if true, would estop the trustees from asserting the statute. It rejected the subcontractor's argument that statements made by the trustees' agents reasonably induced it to believe legal action was unnecessary.

otherwise unavailable to those involved in public works projects. Thus, said the court, the statutes recognize the public interest mandate that public property remain unencumbered by only permitting a lien upon funds the public entity is otherwise obligated to pay to the prime contractor. (119 Cal.App.3d at p. 381.)

The court further declared that the statutes, while recognizing a claimant's right to payment, do not overlook the fact the prime contractor has a legal right to the funds. The public entity, in turn, becomes a custodian of those funds only when served with a stop notice. Thus, "the various stop notice code sections . . . expressly delineate the procedures a claimant must take to intercept the funds which otherwise legally belong to the prime contractor in order to protect the otherwise vulnerable claimant's right to payment by the contractor. The protection afforded to such claimants merely forestalls payment of the funds withheld to the contractor. If the claimant fails to take appropriate actions within the time limits prescribed by section 3210, the stop notice ceases to be effective, the withholding periods terminate, and the claimant's right to the funds terminates as well." (119 Cal.App.3d at p. 383.) In essence, the statutes "demonstrate a public interest in fairness directed towards both the claimant and contractor which commands strict compliance with the procedures set forth in the stop notice codes." (*Ibid.*)

The court then turned to the question of the effect estoppel would have on the rights and duties of the parties. It concluded that if estoppel were applied, the power of the public entity to withhold funds from the contractor would be expanded in contravention of Civil Code section 3210. That section, said the court, "expressly dictates the release of withheld funds to the contractor or other persons to whom they are due. . . . To permit extension of the time period allowed for perfection of stop notices would permit defendant Trustees to continue to withhold funds beyond the period allowed. Extension of the perfection period would effectively sanction a power not expressly provided by the stop notice codes." (119 Cal.App.3d at p. 384, fn. omitted.)

In other words, since the stop notice procedure was implemented for the benefit of the claimant, the onus should be on the claimant to provide nothing short of strict compliance with its requirements. To permit otherwise would require the public entity to do more than mandated by statute. It would also frustrate public policy by suspending the contractor's right to the withheld funds "despite the fact that he [or she] might well rely upon their release . . . after the period of commencing foreclosure actions . . . has lapsed." (119 Cal.App.3d at p. 385.)

*Setting* is distinguishable on its facts. Unlike the subcontractor in that case, Structural filed an action on the stop notice by suing the bonding

company after city bonded around the stop notice. Structural should not be faulted for city's actions in dealing with an unlicensed bonding company. Further, the trial court in *Setting*, "considering plaintiff's action against defendant Trustees other than as a stop notice action . . . found the action barred by Government Code section 945.4." (119 Cal.App.3d at pp. 377-378, fn. omitted.) Unlike the subcontractor in *Setting*, Structural *did* file a claim with city. Thus, it is arguable that Structural's lawsuit could be construed other than as a stop notice action. Indeed, the *Setting* court implied it might have reached a different result had the plaintiff filed an appropriate claim. (*Id.* at p. 385.) Finally, unlike the subcontractor in *Setting*, whose action for damages against the prime contractor survived dismissal of the action on the stop notice (*id.* at p. 385, fn. 10), Structural is no longer able to recover against the contractor. These are all factors which, in our view, portray Structural as more of a victim than a beneficiary of the stop notice code sections. Also, on this record, we have no way of knowing if the city has paid the contractor in full. If it has not, which seems quite likely, it stands to be unjustly enriched at Structural's expense.

In any event, we disagree with *Setting*'s holding. Estoppel can be asserted, as a matter of law, to extend the time limits within which to file an action to enforce a stop notice. We recognize there are circumstances, such as those alluded to in *Setting*, in which applying estoppel might be unfair Those possibilities may be worthy of consideration in assessing the merits of a claimant's position. However, they should not preclude applying the doctrine in the first instance if the city did lull Structural into sitting on its rights and will not be exposed to paying for the same work twice.

We believe the *Setting* court placed too much emphasis on the rights of the public entity and the prime contractor, at the expense of the claimant. While estoppel may not have been appropriate under the facts of that case, it may well be in ours.[9] ██ ██ Indeed, Structural is entitled to have the merits of its position considered.[10]

---

[9]We are curious as to whether the *Setting* court would have ruled as it did if, as is the case with Structural, the subcontractor had no other recourse.

[10]In light of our conclusion, we do not reach Structural's alternative argument that the doctrine of equitable tolling is applicable. However, we do note that Structural's position may have merit.

The doctrine (which, unlike estoppel, turns on the conduct of the plaintiff) "has been applied to soften the harsh impact of such technical rules [as mandatory prescribed statutes of limitations] when to do so would allow a good faith litigant to have his [or her] day in court. [Citation.] The doctrine generally applies '[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one designed to lessen the extent of the injury or damages, . . .' [Citations.]" (*Loehr* v. *Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1084 [195 Cal.Rptr. 576].)

The test for applying the doctrine was reiterated in *Collier* v. *City of Pasadena* (1983) 142 Cal.App.3d 917 [191 Cal.Rptr. 681] where the court, citing *Addison* v. *State of California*

The judgment is reversed. The matter is remanded to the superior court with directions to set aside the judgment and issue a new order denying the motion for summary judgment. Appellant shall receive costs on appeal.

Crosby, J., and Moore, J., concurred.

A petition for rehearing was denied on October 29, 1991, and the following opinion was then rendered:

SONENSHINE, Acting P. J.—In its petition for rehearing, the City of Orange contends our opinion contains a misstatement of material fact. It maintains that Structural Steel "expressly and affirmatively stated that it was *Not* relying upon or asserting an estoppel theory in its Opposition to the Motion for Summary Judgment or on appeal." Thus, it argues a rehearing is required because our opinion is based on an issue which has neither been raised nor briefed. The city is wrong.

Indeed, respondent's brief belies this contention. The city in its brief asserted, "In reality, APPELLANT's alleged facts speak to an estoppel argument under the guise of a tolling argument. . . . APPELLANT sets forth facts which speak to potential estoppel, yet APPELLANT refers to those facts as relating to its tolling argument, apparently in an attempt to steer around the clear holding in the *A. J. Setting Co.* case which unquestionably provides that not even the estoppel theory can be used to extend the time limitations set forth in the Stop Notice Codes." Earlier in its brief, the city stated, "APPELLANT's [tolling] argument is essentially a different breed of the same animal of estoppel which cannot be used to extend the time limitations set forth in the Stop Notice Codes. *A. J. Setting Co., supra.*"

In both instances, the city acknowledged that the issue before the trial court, and on appeal, is whether estoppel could be asserted to extend the applicable statute of limitations. For the city to now contend otherwise is at best disingenuous.

Crosby, J., and Moore, J., concurred.

(1978) 21 Cal.3d 313 [146 Cal.Rptr. 224, 578 P.2d 941], stated, "Justice Richardson mentioned three factors considered in deciding whether 'equitable tolling' should be applied in that case. Subsequent Court of Appeal decisions have treated Justice Richardson's words to have created a definitive three-pronged test for invocation of this doctrine. These three-core elements are: (1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to defendant in gathering evidence to defend against the second claim; and, (3) good faith and reasonable conduct by the plaintiff in filing the second claim." (*Id.* at p. 924, fns. omitted.)